UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ENTON LULGJURAJ,

        Plaintiff,

v.

HURON-CLINTON METROPOLITAN
AUTHORITY, et al.,

        Defendants.

_____/

Case No. 2:23-cv-12931

Honorable Susan K. DeClercq
United States District Judge

**OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT (ECF No. 16), AND DENYING DEFENDANT'S
MOTION TO STRIKE AS MOOT (ECF No. 20)**

In June 2022, Plaintiff Enton Lulgjuraj yelled frustrations and profanities at

Defendant police officers who were responding to a shots-fired incident at a crowded

local park. When Lulgjuraj did not comply with police orders, one of the officers

deployed his Taser and arrested Lulgjuraj. Officers issued Lulgjuraj a misdemeanor

ticket for disorderly conduct and told him that he was banned from the park. Later,

Lulgjuraj was charged with inciting a riot and resisting and obstructing.

Lulgjuraj sued the three officers and the Huron-Clinton Metropolitan

Authority (HCMA, also known as the Huron-Clinton Metropolitan Police

Department), raising claims under 42 U.S.C. § 1983 that the officers used excessive

force in violation of the Fourth Amendment and retaliated against him for exercising

his First Amendment rights. He further alleged that one officer assaulted and battered him and that the HCMA is liable under *Monell* for unconstitutional policies involving inadequate officer training. All Defendants have filed a joint motion for summary judgment and a motion to strike an expert.

## I. BACKGROUND

Plaintiff Enton Lulgjuraj was one of many visitors at Stoney Creek Metro Park (the "Park") in Shelby Township, Michigan on a summer day in June 2022. ECF No. 16-4 at PageID.144; ECF No. 16-8 at PageID.173. At some point during that day, Lulgjuraj "heard a loud bang" and noticed a crowd of visitors growing near the beach and parking lot area, so he went to see "what's going on." ECF Nos. 16-8 at PageID.171–78; 25-1 at PageID.696.

The "loud bang" was a gunshot that triggered law enforcement to respond. ECF No. 16-4 at PageID.144–45; 25-5 at PageID.742. Defendants, Officer Joseph Leo Burns IV, Officer Daniel Edward Allen Jr., and Lieutenant James Belmonte, were already in the area and quickly responded. ECF No. 16-4 at PageID.144–45. While doing so, one of the police vehicles drove past Lulgjuraj as he was walking through the parking lot. ECF No. 16-8 at PageID.177. The vehicle did not have its sirens on and came close enough to Lulgjuraj that he felt that the driver "almost ran [him] over." *Id.*; *see also* ECF No. 16-10 Exhibit 9: HCMA Burns BWC at 1:40–3:31 (hereafter "Burns Bodycam Video").

## A. Pre-Arrest Conduct

Lieutenant Belmonte arrived at the parking lot first, followed by Officer Burns, who observed Lieutenant Belmonte standing beside his police vehicle and already "in a shooting stance with his service gun pointed at" a suspect Jeep Grand Cherokee ("the Jeep") in front of him. ECF No. 16-4 at PageID.145; ECF No. 25-5 at PageID.740, 742. Officer Burns immediately joined Lieutenant Belmonte in the same shooting stance on the opposite side of the police vehicle. Burns Bodycam Video at 3:00–3:16.

Meanwhile, visitors had gathered on both sides of the police vehicle and the Jeep, and the growing crowd started to display some "animosity" toward law enforcement. ECF Nos. 16-3 at PageID.135 (observing "a large crowd developing on both sides of the officers"); 25-5 at PageID.738–39 (claiming that the crowd was yelling "F*** you pigs, f*** the police").

Lulgjuraj, now standing on a grassy area approximately 40 feet from the officers in the parking lot, [1] was recorded on Officer Burns' body camera yelling, in part, as follows:

*Lulgjuraj*: Hey cop, just because you're a cop…What the f*** is wrong

---

[1] Based on video footage from other members of the crowd recording on their cellphones, Lulgjuraj appeared to be across a portion of the parking lot. *See* ECF No. 16-11: Exhibit 10: Plt's Social Media Video at 0:03–0:20 (hereafter "Bystander Video 1"). It is unclear exactly how close he was to the officers and the Jeep.

with you, man? You almost ran me over.

\* \* \*

*Officer Belmonte*: Back away from here. Back away from here.

\* \* \*

*Officer Burns*: Back up away from us.

*Lulgjuraj*: You almost ran me over.

\*\*\*

Lulgjuraj: Come on, man. What do you think you have authority over here?… You're a rookie a\*\* cop, man. You don't even know how to drive. You don't know how to drive. You almost ran me over.

*Officer Allen*: Back away.

*Lulgjuraj*: You almost ran me over bitch.

Officer Allen: Shut the f\*\*\* up.

Burns Bodycam Video at 3:23–3:30, 4:15–4:18, 4:28–4:54; ECF No.34-4 at PageID.1339–40.

During this exchange, the video depicts Officer Burns continuing to have his weapon drawn as he and another officer order the Jeep's driver to exit the vehicle and walk backwards toward them. *See* Burns Bodycam Video at 3:23–5:54. The driver complies, and the other officer handcuffs him. *See id.* at 3:53–4:37. The officer then asks the driver the location of the firearm that had been discharged, as it had not yet been located. *See id.* Officer Allen arrives at approximately this time to witness Officer Burns and Lulgjuraj yelling on the other side of the parking lot. *See*

- 4 -

ECF Nos. 16-3 at PageID.135; 16-1 Exhibit 10: Plt's Social Media Video at 0:00–0:13 (hereafter "Bystander Video 1").

### B. The Arrest

As Lulgjuraj continued yelling, Officer Allen crossed the parking lot between the Jeep and the police vehicle and approached Lulgjuraj on the grassy area. Bystander Video 1 at 0:00–0:13; Burns Bodycam Video at 4:54–4:57. The other onlookers in the crowd fell back as Officer Allen approached, but Lulgjuraj remained where he was, raised his hands in the air, started to back up, and yelled: "You better not touch me!" *See* Bystander Video 1 at 0:08–0:14; *see also* ECF Nos. 16-3 at PageID.135; 34-2 at PageID.1324; 25-1 at PageID.698–70 (noting that the people around Lulgjuraj "scattered" and "started running" when Officer Allen approached). While walking toward Lulgjuraj, Officer Allen ordered him to get on the ground. ECF Nos. 16-8 at PageID.180; 34-2 at PageID.1324; Bystander Video 1 at 0:11–0:13. Lulgjuraj did not do so. *See* Bystander Video 1 at 0:11–0:15.

Upon reaching Lulgjuraj, Officer Allen immediately raised his arm to Lulgjuraj's neck, appearing to try to pull Lulgjuraj to the ground. *See* Bystander Video 1 at 0:13–0:15. Lulgjuraj took some steps back and pushed Officer Allen's arm away, briefly pinning Officer Allen's arm against Lulgjuraj's chest before letting go. *Id.* at 0:15–0:16; *see also* ECF No. 16-9 Exhibit 8: News Report at 0:52–0:56 (hereafter "News Report"). Officer Allen then pushed Lulgjuraj in the chest,

creating distance between the two and deployed his Taser on Lulgjuraj. *See* Bystander Video 1 at 0:16–0:18; *see also* News Report at 0:53–1:00; ECF No. 16-3 at PageID.135. Lulgjuraj touched his chest after the Taser made contact with his sternum area. *See* Bystander Video 2 at 0:00–0:02; *see also* News Report at 1:01–1:05; ECF No. 16-8 at PageID.180–81. He then sank to the ground in a controlled kneel, *i.e.*, not an obvious fall. *See* Bystander Video 2 at 0:00–0:08; *see also* News Report at 0:55–1:06.

Once on the ground, Lulgjuraj remained partially propped up on one elbow before Officer Allen pushed him fully onto the ground and handcuffed him. *See* Bystander Video 2 at 0:03–0:09; *see also* News Report at 1:02–1:07; 16-3 at PageID.135. As this was happening, other officers were yelling at the crowd to back away. *See* Burns Bodycam Video at 5:08–5:24. In the same grassy area where Lulgjuraj was on the ground, Officer Burns pointed his Taser at other onlookers while Officer Allen was handcuffing Lulgjuraj. *Id.* at 5:26–5:38; Bystander Video 1 at 0:32-0:53. Officer Burns helped Officer Allen pull Lulgjuraj to his feet, and they walked him to a police vehicle where he was detained for approximately an hour. *See* ECF Nos. 16-4 at PageID.146; 16-8 at PageID.180, 182; *see also* Bystander Video 1 at 0:40–0:58; News Report at 1:12–1:17; Burns Bodycam Video at 5:38–6:00.

## C. Post-Arrest Events

After Lulgjuraj was placed in the vehicle, Officer Allen's body camera turned on and recorded him saying: "I couldn't, I couldn't stand that. That fucking guy yapping at you guys while you're trying to do your f***ing job. F*** him." Exhibit 17: Def. 36–HCMA Allen BWC at 13:24–13:32 (hereafter "Allen Bodycam Video"); *see* ECF No. 16-18 at PageID.335. Later, Officer Burns's body camera captures officers saying:

> *Officer Burns*: The Tasered guy is in my car.
>
> * * *
>
> *Macomb County Officer*: Did you get him good?
>
> *Officer Burns*: Yeah. I didn't get him, my partner did. He was just, he was just popping off[, "F*** you, f*** you."]
>
> * * *
>
> *Officer Burns:* My partner tased one guy that was getting way too close. We had to drop guns down on the car to back off the crowd.

Burns Bodycam Video at 22:30–22:36, 24:25–24:28, 25:16–25:24; ECF No. 16-10 at PageID.212–13; ECF No. 34-4, PageID.1352–55.

Lulgjuraj was assessed by a medical unit, and as he was released, Officer Burns gave him a ticket for a misdemeanor disorderly conduct charge. ECF Nos. 16-10 at PageID.212; 16-18 at PageID.334; 16-20 at PageID.362; 25-1 at PageID.703. In the "remarks" section of the ticket, Officer Burns wrote: "encroach on shots fire

- 7 -

scene – [i]nciting riot – tazed." ECF No. 16-20 at PageID.362. Lieutenant Belmonte[2] also informed Lulgjuraj that he was banned from the Park. ECF No. 16-12 at PageID.231–32.

One week later, Lulgjuraj and his friends returned to the Park. ECF No. 25-1 at PageID.707. Park staff had been aware of the prior incident, and when they saw Lulgjuraj arrive at the Park, park staff "notified [the officers'] dispatch at the park office that someone had seen [Lulgjuraj] come in and then [Officer Burns] was dispatched to" the Park. ECF No. 25-6 at PageID.801. Several officers, including Officer Burns and Lieutenant Belmonte, arrived and told Lulgjuraj "that [he] was not to come back in the park." ECF Nos. 16-12 at PageID.231–32; 25-1 at PageID.707; 16-21 at PageID.366; *see also* ECF No. 16-21 Exhibit 20: HCMA Beach Video at 1:20–1:45 (hereafter "Beach Bodycam Video"). Lieutenant Belmonte explained to Lulgjuraj that he was banned for "caus[ing] violence" and could not return "[u]ntil the court proceedings were done. Until he was done with

---

[2] In his deposition testimony, Lieutenant Belmonte states that he did not recall exactly who told Lulgjuraj he was banned. ECF No. 16-12 at PageID.231(stating that "[t]hat evening when [Lulgjuraj] was released with the violation that was issued to him, I know that he was—well, I assumed he was informed by either myself or the officer that he was not to come back in the park."); *see also id.* at PageID.232 (stating that "the process was going to be he was going to be released but [Lulgjuraj] was to know that he was not to come back to the park. I don't recall if that was me directly, sir." *Id.* at PageID.232. However, Officer Burns stated that Lieutenant Belmonte was the person who told Lulgjuraj that evening that he was banned. ECF No. 25-6 at PageID.781.

his court process." ECF No. 16-12 at PageID.236; *see* Beach Bodycam Video at 1:20–1:40.

### D. Additional Charges and Procedural History

Later, Lulgjuraj was charged with additional crimes relating to the day he was arrested: (1) inciting a riot and (2) resisting and obstructing. ECF No. 16-8 at PageID.185. The initial disorderly conduct charge and the later inciting-a-riot charge were both dismissed. *Id.* at PageID.186. But Lulgjuraj agreed to plead guilty to the resisting and obstructing charge in exchange for completing the Holmes Youthful Training Act (HYTA) program. *Id.* at PageID.186–87. Upon completion, the resisting and obstructing charge would be dismissed and all court records related to that charge would be sealed. *See id.*; *see also* Mich. Comp. Laws § 762.11(2) (stating that a person between the ages of 18 and 26 who pleads guilty to an offense can be assigned the HYTA program "without entering a judgment of conviction"), § 762.14(1) (providing that "upon final release of the individual from the status as youthful trainee, the court shall discharge the individual and dismiss the proceedings). By November 21, 2024, Lulgjuraj had completed the program. ECF No. 16-8 at PageID.189.

As for Lulgjuraj's ongoing ban from the Park, according to HCMA Director Amy McMillan, officers have inherent authority to ban people from returning to a park where they violated park rules or, in the officer's discretion, endangered public

safety. ECF No. 25-10 at PageID.901. Meanwhile, the officers confirmed that they had banned people from the Park in the past, but they had not been trained or instructed that they had the authority to do so, nor had they checked to determine whether they had such authority. ECF Nos. 25-5 at PageID.751–52; 25-6 at PageID.781.

On November 16, 2023, Lulgjuraj sued the HCMA, Officer Allen, Officer Burns, and Lieutenant Belmonte for various constitutional violations and torts. ECF No. 1. After discovery concluded, Defendants moved for summary judgment. ECF No. 16. Defendants also moved to strike evidence produced by Lulgjuraj's police expert, Thomas Tiderington. ECF No. 20. Lulgjuraj responded to both motions, ECF Nos. 25; 27; and Defendants replied, ECF Nos. 31; 33.

## II. LEGAL STANDARD

To prevail on summary judgment, a movant must identify record evidence showing that there is no genuine dispute of material fact and that they are entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant makes such a showing, then the burden shifts to the nonmovant to identify specific facts that create "a genuine issue for trial," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (citation omitted), which requires more than a mere "scintilla of evidence," *id.* at 252, and more than "metaphysical doubt," *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

All inferences must be reasonable, logical, and drawn in the nonmovant's favor to determine whether any party must prevail as a matter of law. *See Anderson*, 477 U.S. at 251–52.

Because there is clear video evidence of the events in question with no allegations of the videos being altered, this Court cannot adopt a version of the facts that are blatantly contradicted by the video footage. *See Scott v. Harris*, 550 U.S. 372, 378–80 (2007). But where video footage is unclear or could support different outcomes, the facts and all reasonable inferences must be construed in the non-moving party's favor. *See Godawa v. Byrd*, 798 F.3d 457, 463 (6th Cir. 2015). Summary judgment will be granted if the nonmovant fails to establish a genuine issue of material fact on the elements of its case that the moving party has challenged. *See Celotex Corp.*, 477 U.S. at 322. But summary judgment will be denied if the challenged elements have "genuine factual issues that . . . may reasonably be resolved in favor of either party." *Hancock v. Dodson*, 958 F.2d 1367, 1374 (6th Cir. 1992) (citation omitted). This Court has determined that a hearing on the motions is not needed. *See* E.D. LR 7.1(f)(2).

### III. DISCUSSION

Lulgjuraj alleges that Defendants used excessive force in violation of his Fourth Amendment rights by physically "man-handling" him, using a Taser on him while arresting him, and banning him from the Park. ECF. No. 1 at PageID.4. He

also alleges that Defendants retaliated against him for exercising his First Amendment free-speech rights when they arrested him and banned him from the Park. *Id.* He further argues that Officer Allen assaulted and battered him in violation of Michigan law, and that the HCMA is liable under *Monell* for all these actions because of unconstitutional policies that include inadequate training. *Id.* at PageID.4–5. Defendants seek summary judgment on all claims, arguing that the use of force was reasonable, Lulgjuraj was not engaged in a protected activity, and the Defendant officers are protected by qualified immunity. ECF No. 16. They also argue that the HCMA is both not liable for the officers' conduct and does not have unconstitutional policies. *Id.* Each claim will be discussed in turn.

### A. Excessive Force

To bring a claim under 42 U.S.C. § 1983, "a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under the color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988). Lulgjuraj alleges that the force used by Officer Allen during his arrest was excessive and violated his Fourth Amendment right to be free from unreasonable seizures. U.S. Const. Am. IV. Courts analyze such § 1983 claims under the Fourth Amendment's objective reasonableness standard. *Graham v. Connor*, 490 U.S. 386, 395–96 (1989); *Barnes v. Felix*, 605 U.S. 73, 79 (2025) (stating that courts analyze "[a] claim that a law enforcement

office used excessive force during a stop or arrest" under the Fourth Amendment's objective-reasonableness standard).

"[T]he right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Wilkerson v. Warner*, 545 F. App'x 413, 429 (6th Cir. 2013) (internal quotation marks and citation omitted). And "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Graham*, 490 U.S. at 396 (internal quotation marks and citation omitted). Courts assess the reasonableness of the force used from the perspective of a reasonable officer on the scene without the benefit hindsight. *Id.* This is an objective inquiry of "the officer's conduct under the circumstances," *Miller v. Sanilac Cnty.*, 606 F.3d 240, 253 (6th Cir. 2010), regardless of the officer's underlying intentions or motivations. *Graham*, 490 U.S. at 397. The inquiry is a fact-specific test, "and the three most important facts for each case are: (1) the severity of the crime at issue; (2) the threat of immediate danger to the officers or bystanders; and (3) the suspect's attempt to resist arrest or flee." *Kijowski v. City of Niles*, 372 F. App'x 595, 599 (6th Cir. 2010) (internal quotation marks and citation omitted).

But, even if a government official uses excessive force in violation of the Fourth Amendment, the officer may be shielded from liability under the doctrine of qualified immunity if "their conduct does not violate clearly established statutory or

- 13 -

constitutional rights of which a reasonable person would have known." *Stoudemire v. Mich. Dep't of Corr.*, 705 F.3d 560, 567 (6th Cir. 2013) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)) (internal quotations omitted). The doctrine of qualified immunity offers "breathing room [to officers who] make reasonable but mistaken judgments," and "protects all but the plainly incompetent or those who knowingly violate the law." *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012) (citation modified) (quoting *Ashcroft v. Al-Kidd*, 563 U.S. 731 (2011)). Importantly, an officer's "liability must be assessed individually based on his or her own actions." *Pollard v. City of Columbus*, 780 F.3d 395, 402 (6th Cir. 2015) (quoting *Binay v. Bettendorf*, 601 F.3d 640, 650 (6th Cir. 2010)). Ultimately, "qualified immunity depends on (1) whether there was a violation of a constitutional right, and (2) if so, whether that right was clearly established at the time of the violation." *Murphy v. May*, 714 F. Supp. 3d 851, 861 (E.D. Mich. 2024).

In this case, Lulgjuraj alleges that Defendants' general physical handling, Tasing,[3] and banning him from the Park all constituted excessive force in violation

---

[3] Upon review of the record, there does not appear to be a dispute of fact that the Taser did not deploy properly because Lulgjuraj did not receive paralyzing shocks. *See* ECF Nos. 16-13–16-15; 16-22; *see also* Bystander Video 1; Bystander Video 2; News Report. Lulgjuraj states in his deposition that when he got Tased, he "blacked out," did not remember "doing the motion of falling," and his "whole body, like, locked up. And [he] was kind of like—it felt like electricity and burning was going through [his] whole body." ECF No. 16-8 at PageID.181. However, this "mere scintilla of evidence" is outweighed by the overwhelming evidence that the Taser

of the Fourth Amendment. ECF No. 1 at PageID.4. However, Lulgjuraj does not explain how banning him from the Park was excessive force, nor how Officer Burns, Lieutenant Belmonte, or the HCMA were involved in or liable for the physical handling and Tasing acts that Officer Allen alone exercised.[4] Thus, any excessive-force arguments as to the Park ban and the other Defendants' conduct are abandoned and waived, and this Court will address Lulgjuraj's excessive force claim as solely regarding Officer Allen's conduct. *See Brown v. VHS of Mich., Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013) ("[A] plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in a response to a motion for summary judgment.").

---

did not function to administer shocks and incapacitate him. *Anderson*, 477 U.S. at 252. As such, no reasonable jury would find that Lulgjuraj was effectively Tased. However, because even the mere display or brandishing of a nonlethal weapon like a Taser and threatening its use can be excessive force, this Court will consider the ineffective Tasing as an instance of force. *See Murphy*, 714 F. Supp. 3d at 862–63 (finding that displaying a weapon can be excessive in the absence of danger or flight) (collecting cases); *see also Feagin v. Mansfield Police Dep't*, 155 F.4th 595, 604 (6th Cir. 2025) (noting that deploying a Taser is a weapon with nonlethal force).

[4] Although Officer Burns assisted in pulling Lulgjuraj off the ground after being arrested and walked him to the police vehicle, ECF No. 16-4 at PageID.146, Officer Allen alone did the arresting and handcuffing. *See* Bystander Video at 0:03–0:09. This is further substantiated by the fact that Lulgjuraj only brings tort claims against Officer Allen. *See* ECF No. 1 at PageID.6. And to be clear, Lulgjuraj did not present a liability argument for the other defendant officers under a theory of failure to intervene either. *See Smith v. City of Troy, Ohio*, 874 F.3d 938, 946 (6th Cir. 2017) (outlining the test for when an officer may be liable for failing to intervene in another officer's use of excessive force). Thus, even construed in favorable light, Lulgjuraj's complaint offers no basis for alleging that the other defendants used excessive force. *See Anderson*, 477 U.S. at 251–52.

Courts often separately analyze each instance of force to determine whether each instance was excessive. *See, e.g.*, *Murphy*, 714 F. Supp. 3d at 860–67 (analyzing an officer's conduct as distinct acts of pointing a firearm, pushing, and handcuffing); *see also Puskas v. Del. Cnty., Ohio*, 56 F.4th 1088, 1094 (6th Cir. 2023) (noting that courts segment excessive-force claim analyses). But when all instances of force were used for the singular purpose of an arrest, courts may analyze these instances together under the totality of the circumstances. *See, e.g.*, *Lockett v. Donnell*, 38 F. App'x 289, 290–92 (6th Cir. 2002) (analyzing an officer grabbing the plaintiff, pushing him toward the patrol vehicle, and shoving him against the vehicle altogether for excessive force); *Rudlaff v. Gillispie*, 791 F.3d 638, 641–42 (6th Cir. 2015) (analyzing altogether an officer Tasing and "knee strik[ing]" a plaintiff as the collective force used to arrest a plaintiff, and holding that it was not excessive). Therefore, this Court will address whether Officer Allen's physical handling and Tasing of Lulgjuraj while arresting him was reasonable under a totality of the circumstances analysis that considers (1) the crime's severity, (2) the threat of immediate danger, and (3) any attempt to resist arrest. *See Rudlaff*, 791 F.3d at 641–42; *see also Kijowski*, 372 F. App'x at 599.

### 1. Severity of the Crime

"Gauging the severity of an offense is not always a straightforward task." *Shumate v. City of Adrian, Mich.*, 44 F.4th 427, 440 (6th Cir. 2022). Courts may

consider the classification of the offense, as well as whether the plaintiff was "suspected of being involved in an underlying felony" or exacerbating a situation to which an officer was responding. *Id.* at 441–42. Specifically, "[t]he severity of a crime weighs in favor of a finding that the use of force was *not* excessive where an individual is suspected of being involved in an underlying felony, such as when an officer responds to an emergency call or is in pursuit of a known felon." *Id.* (emphasis in original); *see also Collazo v. Otsego Cnty.*, No. 1:23-cv-11849, 2025 WL 2601528, at *10 (E.D. Mich. Sept. 8, 2025) (analyzing relevant factors, including the classification of the plaintiff's offense or suspected offense, the degree of violence of the offense, whether "the plaintiff was suspected of being involved in an underlying crime … [and whether] the officers were responding to an emergency call or the plaintiff was otherwise exacerbating public safety concerns.").

Here, the parties dispute what crimes are relevant to this issue. Accordingly, all three will be addressed.

First, although Lulgjuraj pleaded guilty to the crime of resisting and obstructing, his completion of the HYTA program means that judgment was not entered against him on this charge. *See* Mich. Comp. Laws §§ 762.11(2), 762.14(1). And although resisting and obstructing may be a serious crime that could support the use of force, *see* Mich. Comp. Laws § 750.81d; *see also Collazo*, 2025 WL 2601528, at *11 (finding that the plaintiff's offense of being arrested for resisting

and obstructing, although not inherently violent, "was significantly severe" by "enhancing public safety concerns" during a gunshot investigation), the fact that Lulgjuraj was only later charged with resisting and obstructing suggests that the officers did not interpret Lulgjuraj's conduct as resisting and obstructing at the time of the incident itself. *See* ECF Nos. 16-8 at PageID.185; 16-20; *see also Williams v. Maurer*, No. 19-10850, 2020 WL 5412191, at *11 (E.D. Mich. Sept. 9, 2020) (considering what the plaintiff was charged with or arrested for at the time of the arrest and what a reasonable officer would have known and witnessed when he was encountering the plaintiff to determine what the crime at issue was). This is because "the reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene *at that time*, 'rather than with the 20/20 vision of hindsight.'" *Sheffey v. City of Covington*, No. 08-238, 2012 WL 28056, at *10 (E.D. Ky. Jan. 5, 2012) (considering the crime that the officers suspected the plaintiff was committing at the time he was stopped) (quoting *Graham*, 490 U.S. at 396). Therefore, the resisting and obstructing charge does not factor into the overarching Fourth Amendment analysis here. *See Kijowski*, 372 F. App'x at 599.

Second, the officers ticketed Lulgjuraj with a misdemeanor of disorderly conduct on the day of the incident, which, by itself, is usually not a violent or serious crime. *See Goodwin v. City of Painesville*, 781 F.3d 314, 322 (6th Cir. 2015) ("A jury could conclude that disorderly conduct is not a 'serious' crime when

- 18 -

determining whether an officer used excessive force in effecting the arrest for that crime."); *see also Thacker v Lawrence Cnty.*, 182 F. App'x 464, 472 (6th Cir. 2006) (holding that "disorderly conduct is not a violent or serious crime, and this fact weighs in favor of using less force in arresting [a suspect]"). Given that this was the only charge against Lulgjuraj at the time of the ticketing, the charge by itself would not justify using excessive force. *See Goodwin*, 781 F.3d at 322.

But in this case, the crime *at issue* and most relevant for this Court's analysis is the underlying one involving the discharge of a firearm in a crowded public park. *See Shumate*, 44 F.4th at 441–42. For bystanders present during unfolding criminal activity, courts may consider the severity of the unfolding crime and the bystander's conduct in relation to it. *See id.*; *see also Phillips v. Blair*, 786 F. App'x 519, 530 (6th Cir. 2019). For example, in *Phillips v. Blair*, the plaintiff became an accidental bystander when he parked his truck by a building at which officers believed a burglary was taking place. 786 F. App'x at 522. The officers used force to remove him from his truck because the circumstances suggested that he was potentially involved with the burglary. *Id.* at 522–23. They ultimately arrested him for obstructing the investigation, for which he was later acquitted. *Id.* at 523. Although the plaintiff was charged with obstruction, the Sixth Circuit held that the crime at issue was the burglary—and the plaintiff's potential involvement therein—which is a serious crime that weighed in favor of the officer's use of force. *Id.* at 530.

In *Shumate*, the plaintiff arrived to help his daughter, who had been ticketed for a misdemeanor involving her vehicle registration. 44 F.4th at 433–35. After a verbal altercation between the plaintiff and the officer, the officer Tased, punched, and arrested the plaintiff, who was then charged with resisting and obstructing. *Id.* at 434–37. The Sixth Circuit observed that the severity of the crime weighed against the officer's use of force because the plaintiff was not involved in an underlying crime and the officer was not responding to a dangerous emergency. *Id.* at 440–42.

Most analogous to the present case is *Collazo v. Otsego County*, in which the plaintiff's offense of resisting and obstructing—which was later dismissed—rose to a higher level of severity under the circumstances. 2025 WL 2601528, at *11. As the district court explained:

> [The] Plaintiff was argumentative, disruptive, and uncooperative during an emergency shots-fired call, enhancing public safety concerns by hindering [the] Defendant [police officer's] investigation and preventing him from swiftly securing the property. And [the] Plaintiff was a potential suspect in a serious gun-related offense, considering dispatch relayed that a man and a woman were reportedly involved in the shots-fired incident. So this factor supports the reasonableness of [the] Defendant [officer's] relatively modest use of force [when he grabbed her arm, arrested her, and escorted her to a police vehicle during which she fell twice].

*Id.*

Thus, although the plaintiff in *Collazo* was not being violent, the underlying shots-fired incident that was unfolding was so serious that it impacted the reasonableness of the officers' conduct toward her. *Id.*

- 20 -

Similarly, in the present case, the record indisputably shows that the officers were actively responding to a dangerous situation involving the discharge of a firearm in a crowded public space and an unknown number of suspects or firearms. *See* ECF Nos. 16-4 at PageID.144–45; 25-5 at PageID.740–42; *see generally* News Report. The officers also make clear in their depositions that they did not yet know who was involved, and they began to suspect Lulgjuraj's involvement because instead of responding to their orders to back away, he "encroached" on the scene and appeared to intentionally distract them while they had their weapons drawn at a suspect vehicle. ECF Nos. 16-3 at PageID.135, 138–39; 16-12 at PageID.234–35. As the misdemeanor ticket describes, Officer Burns perceived Lulgjuraj's conduct as a dangerous "encroach[ment] on shots fire[d] scene." ECF No. 16-20 at PageID.362; *see also* News Report at 1:19–1:23 (portraying Lulgjuraj saying "[l]ook what [the ticket] says, 'encroached on shots-fired scene – inciting riot'"). Thus, Lulgjuraj's proximity and conduct at an actively unfolding and dangerous, shots-fired situation weighs in favor of finding that Officer Allen's use of force was reasonable. *See Collazo*, 2025 WL 2601528, at \*11; *see also Phillips*, 786 F. App'x at 530.

### 2. Threat to Safety

People who pose no safety risk to law enforcement or bystanders have a right "to be free from gratuitous violence during arrest." *Gambrel v. Knox Cnty. Ky.*, 25

- 21 -

F.4th 391, 403 (6th Cir. 2022) (internal quotation marks and citation omitted). A plaintiff's perceived threat level must be more than "mere agitated hand gestures and profanity, unaccompanied by threats." *Shumate*, 44 F.4th at 444 (internal quotation marks and citation omitted)).

But where an officer is responding to a dangerous situation and facing "substantial uncertainty" regarding an active shooter, even a plaintiff's nonviolent but "disruptive behavior—specifically interrupting and demanding that the officers leave"—can expose officers and others to serious harm. *Collazo*, 2025 WL 2601528, at *11. Indeed, the Sixth Circuit has held that an officer forcefully bringing a bystander to the ground—resulting in her falling down stairs and breaking her wrist—during a response to a shots-fired incident even after the shooter was detained—was reasonable when the firearm had not been located yet. *Walters v. Stafford*, 317 F. App'x 479, 491–92 (6th Cir. 2009). Nevertheless, "general bedlam does not necessarily justify the use of force against any particular individual." *Kijowski v. City of Niles*, 372 F. App'x 595, 600 (6th Cir. 2010).

Here, Lulgjuraj's actions in refusing to cooperate with the officers' orders to back away and instead continuing to distract the officers during an incident involving an unlocated firearm and a large crowd presented a threat to the safety of the officers and the public. *See id.*; *see also Collazo*, 2025 WL 2601528, at *11. Officer Allen's use of force to grab, push, and arrest him were therefore reasonable for this factor.

*See Lockett*, 38 F. App'x at 291–92 (holding that an officer pushing a suspect in a rough manner was not excessive force where the suspect was verbally abusive and uncooperative).

As to Officer Allen's use of a Taser on Lulgjuraj, "[a]n officer's use of a Taser is permissible where a suspect poses an immediate threat in the form of violent thrashing, an attempt to hit officers, or by making a display of force." *Shumate*, 44 F.4th at 444 (citation modified); *compare with Grady v. Cratsenburg*, 769 F. Supp. 3d 609, 662 (E.D. Mich. 2025) (noting that failing to comply with orders to back up from a police investigation did not demonstrate a threat to warrant Tasing). Here, the record does not plainly show that Lulgjuraj was "violent[ly] thrashing, [attempting] to hit officers, or [] making a display of force." *See Shumate*, 44 F.4th at 444. Although Defendants present evidence that Lulgjuraj posed a physical threat, *see* ECF Nos. 16-16; 16-23 at PageID.467, when viewed in a light most in Lulgjuraj's favor, the record does not unquestionably establish that at the time Officer Allen approached him, he was posing an immediate threat so as to warrant Tasing. *See Shumate*, 44 F.4th at 444.

Therefore, this factor weighs in favor of Officer Allen's use of force in all respects except the Tasing. *See id.*

### 3. Resisting Arrest

In examining use of force, especially with a Taser, courts consider whether the plaintiff was actively or passively resisting arrest. *Jackson v. Washtenaw Cnty.*, 678 F. App'x 302, 306 (6th Cir. 2017). Passive resistance involves verbal noncooperation and lacks "physical resistance or verbal antagonism." *Id.*; *see also Collazo*, 2025 WL 2601528. at *12 (collecting cases). In passive resistance instances, some force may be permitted, but substantial force like striking or Tasing is considered excessive. *See, e.g.*, *Shumate*, 44 F.4th at 447; *Goodwin*, 781 F.3d at 323–28.

In contrast, active resistance involves a plaintiff "physically struggling with police, threatening them, resisting handcuffs, or acting erratically." *Moore v. Oakland Cnty.*, 126 F.4th 1163, 1168 (6th Cir. 2025). Accordingly, "[a]ctive resistance to an officer's command can legitimize an officer's use of a Taser," and other methods of more substantial physical force to arrest the person. *Goodwin*, 781 F.3d at 323; *see Rudlaff*, 791 F.3d at 641–43 (holding that Tasing and knee striking was not excessive because the plaintiff was actively resisting arrest). "[N]oncompliance alone does not indicate active resistance; there must be something more. It can be a verbal showing of hostility, … [or it] can also be a deliberate act of defiance using one's own body." *Eldridge v. City of Warren*, 533 F. App'x 529, 535 (6th Cir. 2013).

- 24 -

Under this precedent, Defendants argue that no reasonable jury could conclude that Lulgjuraj was passively resisting because the video evidence shows him pushing away Officer Allen's hand and briefly pinning Officer Allen's arm. *See* Bystander Video 1; Bystander Video 2; News Report. Had Lulgjuraj simply not complied with Officer Allen's verbal commands to get on the ground by staying upright or had he only been generally argumentative, he might reasonably be seen as passively resisting. *See Shumate*, 44 F.4th at 447–48. But because Lulgjuraj swung his arms, pushed Officer Allen away, pinned Officer Allen's arm briefly, and refused to comply, the case law requires a finding that Lulgjuraj actively resisted arrest. *See Rudlaff*, 791 F.3d at 643 ("When a person resists arrest—say, by swinging his arms in the officer's direction, balling up, and refusing to comply with verbal commands—the officers can use the amount of force necessary to ensure submission."). Therefore, this factor weighs in favor of finding that it was objectively reasonable for Officer Allen to push Lulgjuraj and deploy a Taser to effectual his arrest. *See id.*; *see also Goodwin*, 781 F.3d at 323.

Considering the three factors under *Graham* within the totality of the circumstances, this Court must find that Officer Allen's use of force was objectively reasonable and did not violate Lulgjuraj's Fourth Amendment rights. The facts, even when viewed in a light most favorable to Lulgjuraj, show as follows: (1) the severity of the offense at issue—a shots-fired incident—was serious; (2) Lulgjuraj posed

some degree of threat to the officers and bystanders' safety by disrupting the active investigation involving a firearm after not complying with orders to back away; and (3) he actively resisted arrest by pushing Officer Allen and physically not cooperating.

### 4. Qualified Immunity

Even if a reasonable jury could find that Officer Allen violated the Fourth Amendment because Lulgjuraj "did not resist *enough* to justify" the grab, push, or use of a Taser, *Rudlaff*, 791 F.3d at 643 (emphasis in original), qualified immunity steps in to shield him from liability.

As the Sixth Circuit has described, the doctrine of qualified immunity "is an 'exacting standard' that gives officers lots of leeway, requiring their conduct to violate clearly established law to defeat the defense" *Id*. (quoting *San Franscico v. Sheehan*, 575 U.S. 600, 611 (2015)). For qualified immunity to not apply, existing case law "must put the precise question 'beyond debate'." *Id.* (quoting *Ashcroft*, 563 U.S. at 741).

With respect to Taser usage, courts in the Sixth Circuit will only impose liability "in the rare instance where an officer tases a suspect who posed no danger and was fully compliant with officer commands or had completely ceased resisting at the time of the tasing." *Feagin v. Mansfield Police Dept.*, 155 F.4th 595, 604 (6th Cir. 2025). "Active resistance" can take the form of not just physical struggles, but

also for conduct that is "intuitively not all that active," such as "verbal hostility or a deliberate act of defiance." *Id.* (quoting *Wright v. City of Euclid*, 962 F.3d 852, 867 (6th Cir. 2020). And where a situation falls into "'the hazy border between excessive and acceptable force,' the 'proper course is to grant summary judgment to the officers on qualified immunity grounds.'" *Id.* (quoting *Rudlaff*, 971 F.3d at 644).

Here, because Lulgjuraj did not immediately comply with orders to get on the ground, there was some physical struggle between him and Officer Allen, and there were accompanying circumstances that presented some danger, it appears that the caselaw that is binding on this Court requires a finding that qualified immunity applies. *See id.*

As perhaps can be read in the tone of its analysis, this Court is troubled by this case, where the outcome does not align with a common-sense interpretation of the events that transpired here because of binding caselaw on officers' use of force and qualified immunity. *Williams v. City of Flint.*, 814 F. App'x 973, 979 (6th Cir. 2020). What was meant to give officers "breathing room to make reasonable but mistaken judgments," *Stanton v. Sims*, 571 U.S. 3, 6, (2013) (per curiam), now has been expanded so far as to encompass even instances that fall within a "zone of twilight" or "hazy border" of acceptable force. *Feagin v. Mansfield Police Dep't*, 155 F.4th 595, 605 (6th Cir. 2025) (quoting *Rudlaff*, 791 F.3d at 644).

This Court is wary of qualified immunity's reach because it casts a wide net over what constitutes an officer's reasonable reactions while conversely requiring that the claimant be *unreasonably* nonreactive in a tense situation where it would otherwise be quite reasonable to cower, cry out, or instinctively block oncoming physical contact. *See, e.g.*, *Wylie v. Overby*, No. 05-CV-71945, 2006 WL 1007643, at *2–8 (E.D. Mich. Apr. 14, 2006) (finding that qualified immunity applied in this "hazy border" case where officers Tased after a plaintiff who initially attempted to flee but then changed his mind and raised his arms in apparent surrender); *Alexander v. city of Shelby Twp.*, No. 11-1378, 2009 WL 3241974, at *1 (E.D. Mich. Oct. 8, 2009) (finding that the officer Tasing the plaintiff was not unreasonable because the plaintiff "failed to enter a patrol car upon multiple requests," despite there being a question of fact of how much the plaintiff really posed a threat).

Thus, this Court is deeply concerned that important mechanisms for officer accountability are being consumed by the expanding caselaw on qualified immunity, which affords unjustly broad latitude to officer conduct. *See* Joanna C. Schwartz, *Qualified Immunity's Boldest Lie*, 88 U. CHI. L. REV. 605, 605 (2021) ("There is a growing consensus among courts, scholars, and advocates across the ideological spectrum that qualified is legally unsound, unnecessary to shield government officials from the costs and burdens of litigation, and destructive to police accountability efforts."); *see also* Taylor Elyse Mills, *Intersectionally-Informed*

- 28 -

*Advocacy: A Structural Justice Account of Wrongful Convictions for Sexual Violence*, 31 UCLA J. GENDER & L. 221, 226 (2024) (suggesting that "[e]nding qualified immunity would be a step in the right direction toward establishing officer accountability."). Nevertheless, this Court is constrained by this officer-friendly precedent and must grant summary judgment in Defendants' favor for the excessive force claims.

### B. Assault and Battery

Lulgjuraj also brings a claim for assault and battery against Officer Allen for using physical force and Tasing him "unprovoked." ECF No. 1 at PageID.6. Defendants argue that Officer Allen is immune from state tort claims under government immunity because he acted reasonably under the circumstances. ECF No. 16 at PageID.113. Lulgjuraj responds that Officer Allen is not immune because his actions constituted excessive force and retaliation, *i.e.*, not made in good faith. ECF No. 25 at PageID.682–83. For reasons explained below, there is no dispute of fact that Officer Allen acted reasonably in good faith.

"[U]nder Michigan law, an assault and battery claim against a police officer requires proof that the officer's actions 'were not justified because they were not objectively reasonable under the circumstances.'" *Murphy*, 714 F. Supp. 3d at 869 (quoting *Bell v. Porter*, 739 F. Supp. 2d 1005, 1015 (W.D. Mich. 2010)). Because government officials may need to act in ways that would otherwise incur liability for

intentional torts, officials are entitled to governmental immunity if "(1) he was acting in [the] course of his employment and at least reasonably believed that he was acting within [the] scope of his authority, (2) that his actions were discretionary in nature, and (3) that he acted in good faith." *Id.* (quoting *Odom v. Wayne Cnty*, 760 N.W.2d 217, 228–29 (Mich. 2008)). Under Michigan law, the nature of governmental immunity is subjective because it "protects a defendant's honest belief and good-faith conduct with a cloak of immunity while exposing to liability a defendant who acts with malicious intent." *Smith v. Stoneburner*, 716 F.3d 926, 934 (6th Cir. 2013) (internal quotation marks and citation omitted).

The first element considers whether the employee reasonably believed they were acting within the scope of their employment, even if they later learn they were mistaken. *See Odom*, 760 N.W.2d at 224. Under the second element, a discretionary act is one that "requires personal deliberation, decision, and judgment." *Thomas v. Lambert*, 600 F. Supp. 3d 793, 807 (E.D. Mich. 2022) (citation modified). For example, a police officer uses judgment "to determine the amount of force necessary to effectuate an arrest," whereas the officer conducts ministerial acts when the officer completes "activity logs and police reports or follow[s] the procedures for booking an arrested person." *Odom*, 760 N.W.2d at 226. For the third element, "[g]ood faith is defined as 'without malice.'" *Bell*, 739 F. Supp. 2d at 1015 (quoting *Odom*, 760

N.W.2d at 225). Evidence of malice includes a lack of probable cause,[5] *Miller*, 606 F.3d at 254, or conduct "that shows such indifference to whether harm will result as to be equal to a willingness that harm will result," *i.e.*, wanton misconduct. *Odom*, 760 N.W.2d at 225 (quoting Mich. Civ. Jury Instructions 14.11 and 14.12) (internal quotation marks omitted).

There is no dispute of fact that Officer Allen was acting with discretion and within the scope of his employment to help secure a scene and effectuate an arrest. *See Thomas*, 600 F. Supp. 3d at 807; *Odom*, 760 N.W.2d at 224, 226. But the parties diverge over whether Officer Allen acted in good faith. However, because this Court has already determined that Officer Allen's use of force was objectively reasonable under the circumstances to preclude Lulgjuraj's § 1983 claims, there is no dispute of fact that Officer Allen's use of force was also in good faith. *Stratford v. Merlo*, No. 12-CV-13013, 2013 WL 3895439, at *8 (E.D. Mich. July 29, 2013) (granting summary judgment on assault and battery claims because summary judgment was deemed proper for the excessive force claim).

---

[5] Notably, neither party directly addresses whether Officer Allen had probable cause to arrest Lulgjuraj. Although Lulgjuraj generally argues that Defendants were obligated to "refrain from unlawfully seizing and arresting Lulgjuraj with the use of excessive and unreasonable force" pursuant to the Fourth Amendment, ECF No. 1 at PageID.4, he does not put forth an unlawful arrest/lack of probable-cause claim in his complaint or argument in response. Therefore, this Court will not address it. *See Brown*, 545 F. App'x at 372 (declining to address arguments deemed waived).

Moreover, courts can treat the objective reasonableness standard for § 1983 excessive force claims as equivalent to the objective-reasonableness standard for Michigan assault and battery claims. *Wells v. City of Dearborn Heights*, 538 F. App'x 631, 641 n. 3 (6th Cir. 2013); *see also Stratford*, 2013 WL 3895439, at *8 (granting summary judgment in the defendant officer's favor for assault and battery "[f]or the reasons discussed earlier in this opinion granting [the defendant officer] summary judgment on the excessive force claim"). Therefore, "if a police officer's actions are objectively reasonable under the circumstances [of the arrest], he cannot be held liable for assault and battery under Michigan tort law." *Id.* at 640. Given that Officer Allen's use of force was reasonable pursuant to § 1983, as a matter of law he acted in good faith when he used force to arrest Lulgjuraj. *See Stratford*, 2013 WL 3895439, at *8. Accordingly, Officer Allen is entitled to governmental immunity, and summary judgment in Defendants' favor will be granted for these state tort law claims. *See id.*

### C. First Amendment Retaliation

Plaintiff alleges that Officer Allen violated his First Amendment right to free speech by using physical force against him and that Officer Burns and Lieutenant Belmonte also violated this right by banning him from the Park. ECF No. 1 at PageID.4 (alleging general First Amendment violations against all Defendants); ECF No. 25 at PageID.681 (clarifying which Defendants he alleges violated his

rights and for which reasons). Defendants argue that these claims fail because Lulgjuraj's conduct was not protected speech, and even if it were, Lulgjuraj fails to demonstrate a causal connection between his yelling and the adverse actions. ECF No. 16 at PageID.107–08. Defendants also argue that Defendants "should be entitled to qualified immunity for this claim." *Id.* at PageID.108. Lulgjuraj responds that a jury could find that a reasonable officer would have known that he was violating a person's First Amendment right to criticize police when he used force against him. ECF No. 25 at PageID.680.

"[A]s a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions for engaging in protected speech." *Nieves v. Bartlett*, 587 U.S. 391, 398 (2019) (citing *Hartman v. Moore*, 547 U.S. 250, 259 (2006)). To prevail on a First Amendment retaliation claim, a plaintiff must demonstrate that: "(1) he or she engaged in protected conduct; (2) the defendant took an adverse action against the plaintiff that would deter a person of ordinary firmness from continuing to engage in the conduct; and (3) a causal connection exists between the protected conduct and the adverse action." *Davis v. Walleman*, 596 F. Supp. 3d 877, 893 (E.D. Mich. 2022) (citing *Nieves*, 587 U.S. at 398–99). "If the plaintiff shows that the protected conduct was at least a substantial or motivating factor behind the defendant's adverse action, then the burden shifts to the defendant

to show he would have taken the same action even if the plaintiff had not engaged in protected conduct." *Sevy v. Barach*, 815 F. App'x 58, 63 (6th Cir. 2020).

But an officer still may be shielded from liability under the doctrine of qualified immunity, depending "on (1) whether there was a violation of a constitutional right, and (2) if so, whether that right was clearly established at the time of the violation." *Murphy*, 714 F. Supp. 3d at 861.

### 1. Use of Force

Lulgjuraj claims that Officer Allen retaliated against him for exercising his free speech rights by using force during his arrest. But because Lulgjuraj has not demonstrated that there was a clearly established right, Officer Allen is entitled to qualified immunity.

First, Lulgjuraj mentions his arrest in the context of alleging retaliation only once in his response to Defendants' motion. *See* ECF No. 25 at PageID.678 ("The first cause of action pertains to Defendant Allen's violation of Lulgjuraj's First Amendment right to criticize police activity when Defendant Allen engaged, assaulted and arrested Lulgjuraj."). However, his complaint and the remainder of his response focus solely on Officer Allen's use of force *during* the arrest; that is, Lulgjuraj does not present an argument that the arrest *itself* was a retaliatory adverse action. Indeed, he brings no probable-cause challenges. *See Sevy*, 815 F. App'x at 63 ("But to establish a retaliatory arrest, plaintiffs generally must prove that the

- 34 -

arresting officer lacked probably cause."). Therefore, Lulgjuraj is left only with the argument that *the force* Officer Allen used when carrying out the arrest was retaliatory. *See Sevy*, 815 F. App'x at 63 (focusing on the force used to arrest the plaintiff to analyze his retaliation claim because the plaintiff did not bring a probable-cause challenge).

But the Sixth Circuit determined in 2020 that recovery on a First Amendment retaliation theory because of excessive force used in an arrest[6] is not a clearly established right. *See id.* at 64. As held in *Sevy v. Barach*, in the absence of caselaw establishing a "right to recover—on a First Amendment retaliation theory—for excessive force used in executing an arrest," an officer is entitled to qualified immunity. *Id.* at 63–64. In fact, the Sixth Circuit specifically noted that the case was not about isolated physical force but rather involved "whether the use of excessive force in executing an arrest" could be a First Amendment violation instead of simply a Fourth Amendment violation. *Id.* at 64 (holding that "[t]his is at least an open question, and existing precedents do not answer that question 'beyond debate' in [the plaintiff's] favor. Thus, [the plaintiff's] First Amendment right to recover under this *hybrid theory* is not clearly established" (emphasis added).).

---

[6] True, the panel in *Sevy* specifically contemplated a lawful arrest. But importantly, as noted, Lulgjuraj does not challenge the lawfulness of his arrest.

Lulgjuraj has not presented any caselaw since the 2020 *Sevy* decision and his arrest that establishes this "hybrid theory" right to recover under the First Amendment. *See id.*; *see also* ECF No. 25 at PageID.678–80. Therefore, this Court is bound by the precedent under *Sevy* and finds that Officer Allen is entitled to qualified immunity. *See Sevy*, 815 F. App'x at 64; *see also Murphy*, 714 F. Supp. 3d at 861; *Anderson v. Creighton*, 483 U.S. 635, 640 (1987) (holding that a plaintiff does not need to provide "a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate").

### 2. Ban from Park

As for Lulgjuraj's assertion that Lieutenant Belmonte and Officer Burns violated his First Amendment rights by banning him from the Park in retaliation for his speech, it is a closer question but ultimately is still unsuccessful.

As previously stated, to establish a First Amendment retaliation claim, the plaintiff must show that the defendant acted adversely against the plaintiff because of the plaintiff's engagement in protected conduct under the First Amendment. *Wilkerson*, 545 F. App'x at 423.

"It is well-settled that the freedom to criticize public officials and expose their wrongdoing is a fundamental First Amendment value." *Wilkerson*, 545 F. App'x at 424 (internal quotation marks and citations omitted). Protected speech therefore can include criticism of law enforcement, including the use of profanity. *See City of*

*Houston, Tex. v. Hill*, 482 U.S. 451, 461 (1987). ("[T]he First Amendment protects a significant amount of verbal criticism and challenge directed at police officers."); *Lewis v. City of New Orleans*, 415 U.S. 130, 132–33 (1974)(Yelling obscenities at an officer is protected speech); *Davis v. Walleman*, 596 F. Supp. 3d 877, 893 (E.D. Mich. 2022) (criticizing an officer's behavior in a citizen encounter is protected speech). However, "disorderly conduct is not protected activity." *Sevy*, 815 F. App'x at 63. So, mere offensive speech against law enforcement "when unaccompanied by other conduct" is protected, but "behavior involving more than mere epithets provides probable cause for a disorderly conduct arrest." *Wood*, 25 F.4th at 424.

Adverse actions can include the use of force, an arrest, or being removed from a public space under certain circumstances. *See Nieves*, 587 U.S. at 404; *see also Davis*, 596 F. Supp. 3d at 893; *Wilkerson*, 545 F. App'x at 425; *Wood v. Eubanks*, 25 F.4th 414, 429 (6th Cir. 2022). And the "plaintiff must establish a causal connection between the government defendant's retaliatory animus and the plaintiff's subsequent injury." *Nieves*, 587 U.S. at 398 (internal quotation marks and citation omitted). The causation element is important, "meaning that the adverse action against the plaintiff would not have been taken absent[, or but-for,] the retaliatory motive." *Id.* at 399.

Here, there is no dispute that Lulgjuraj experienced an adverse action by being banned from a public space. *See Wood*, 25 F.4th at 429 (noting that the threshold is

low for showing that an action deterred a person of ordinary firmness to exercise a First Amendment right, which is an act that is more than mere threats or a slight, minor, or petty annoyance); *see also Norris v. City Asheville*, 721 F. Supp. 3d 404, 416 (W.D.N.C. 2024) (finding that the plaintiffs who were banned for three years from a public park after peacefully protesting stated a plausible claim for First Amendment retaliation).

But Defendants argue that Lulgjuraj did not engage in protected activity because he did not simply criticize the officers. ECF No. 25 at PageID.680. Rather, his "conduct was substantially similar to an act of violence [by yelling] at officers in the midst of their felony firearm stop" and distracting them from the active investigation, ECF No. 16 at PageID.107. Indeed, in isolation, Lulgjuraj yelling criticism and profanities at law enforcement would be a protected activity, *see Lewis*, 415 U.S. at 132–33, but here, his speech was accompanied by other conduct that could fall under the umbrella of disorderly conduct—which is not a protected activity—given the unfolding circumstances. *See Wood*, 25 F.4th at 423–24.

Lulgjuraj testified that he began yelling at the officers before they engaged with the Jeep. ECF Nos. 25-1 at PageID.697–98. None of the video evidence presents a complete picture of the beginning of this encounter. But as discussed above, it is undisputed that Lulgjuraj defied police orders to back away and continued to yell at the officers while they were handling a tense, still unfolding

situation involving gunshots being fired at a crowded park, so his speech was accompanied by "behavior more than mere epithets," to which Officer Allen responded. *See id.*; *see also Terminiello*, 337 U.S. at 4.

To be sure, there is some uncertainty as to the true reason that Lulgjuraj was banned from the park. For example, the reason the officers gave for banning Lulgjuraj as "causing violence," ECF No. 16-21 at PageID.366, does not align with them issuing a ticket for disorderly conduct. *See* MICH. COMP. LAWS § 750.167 (outlining bases for disorderly conduct which do not clearly include "causing violence"). Indeed, the record shows that when the officers banned Lulgjuraj from the Park, they were not aware of whether they even had the authority to do so. *See* ECF 25-5 at PageID.751-52; ECF No. 25-6 at PageID.781; 25-10 at PageID.901. And even more tellingly, in the body camera footage that began recording after Lulgjuraj had been arrested but before he was ticketed, Officer Allen can be heard saying: "I couldn't, I couldn't stand that. That f***ing guy yapping at you guys while you're trying to do your f***ing job. F** him." Allen Bodycam Video at 13:24– 13:32; *see* ECF No. 16-18 at PageID.335. And Officer Burns was recorded saying that Lulgjuraj "was just popping off, [saying] 'F*** you, f*** you.'" Burns Bodycam Video at 24:25–24:28; *see* ECF No. 16-10 at PageID.212.

However, given this Court's holding that Lulgjuraj speech was subsumed under the unprotected activity of disorderly conduct, no constitutional violation has

- 39 -

been established. Accordingly, Defendants Officer Burns and Lietenant Belmante are entitled to summary judgement for this claim as well.

### D. HCMA's *Monell* Liability

Lastly, Lulgjuraj alleges that the HCMA is liable under *Monell* for failing to train officers, which caused the officers to violate his constitutional rights. *See* ECF No. 1 at PageID.5. Defendants argue that no such constitutional violations occurred, but even if they had, Lulgjuraj fails to present evidence of wrongful practices. *See* ECF No. 31 at PageID.1257. This Court agrees with Defendants.

In *Monell*, the Supreme Court held that municipalities can be treated as "persons" and subject to § 1983 liability. *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 690 (1978). But "a municipality cannot be held liable [under § 1983] solely because it employs a tortfeasor." *Id.* at 691 (citation modified). And a municipality cannot be liable if their officers commit no constitutional violation in the first place. *Roell v. Hamilton Cnty., Ohio*, 870 F.3d 471, 487 (6th Cir. 2017). Municipalities are only liable under *Monell* for their "official policies" which *cause* an employee to violate another's constitutional rights. *Monell*, 436 U.S. at 692; *see also Alston v. City of Detroit Police Officers*, 717 F. Supp. 3d 618, 635 (E.D. Mich. 2024) ("To hold a municipality liable under § 1983, a plaintiff must show the alleged constitutional violation was due to a municipal policy or custom.").

- 40 -

Generally, a plaintiff has four avenues for showing "an illegal policy or custom" under *Monell*: "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations." *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013); *see also Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986). But, even when a plaintiff can show a sufficient official policy, a plaintiff must also "connect the policy to the municipality, and [demonstrate that the] particular injury was incurred due to the execution of that policy." *Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 403 (6th Cir. 2010).

Here, Lulgjuraj pursues *Monell* liability under the "failure to train" theory, arguing that the HCM failed "to provide adequate training…[regarding] to refrain from retaliating against an individual for constitutional protected speech and using excessive and unreasonable force" like deploying a Taser. ECF No. 1 at PageID.5; *see also* ECF No.25 at PageID.684 (arguing that the HCM failed to train officers on use of force and permissible banning procedures). Because Lulgjuraj's Fourth Amendment claims and tort claims will be dismissed, the HCMA may not be held liable for these claims. *See Davenport v. Causey*, 521 F.3d 544, 554 (6th Cir. 2008) (holding that the city was not liable because the court held no constitutional

- 41 -

violations occurred). This leaves only his First Amendment retaliation claim for this Court to consider as a basis for holding the HCMA liable.[7]

Defendants contend that Lulgjuraj's claim fails because he did not present evidence that the HCMA has a policy or custom of retaliatory banning. ECF No. 31 at PageID.1257. Lulgjuraj argues that the HCMA's lack of a written policy and training about "an officer's alleged power to arbitrarily ban someone from the Park for an indefinite amount of time," coupled with a history of officers banning people from the Park previously, show that the HCMA was deliberately indifferent to Lulgjuraj's injury of being banned for his speech. ECF No. 25 at PageID.685. As explained below, this Court will grant summary judgment on this issue because Lulgjuraj did not present evidence of prior instances of unconstitutional conduct.

Under the "failure to train" theory, the plaintiff must show that the municipality's "training or supervision was inadequate" because of "the municipality's deliberate indifference." *Craddock v. Cnty. of Macomb*, 718 F. Supp. 3d 683, 706 (E.D. Mich. 2024) (internal quotation marks and citation omitted). The

---

[7] Defendants initially argued that Lulgjuraj did not properly plead a *Monell* claim under the First Amendment. ECF No. 16 at PageID.110 n. 7. Lulgjuraj disagreed but otherwise sought leave to amend his complaint if this Court found that his pleading was inadequate. ECF No. 25 at PageID.685. This Court finds that his complaint was sufficient to state a *Monell* claim under the First Amendment and will address it herein. And this Court will deny his request for leave under the local rules' prohibition on motions embedded in response briefs. E.D. LR 5.1(e); 7.1(i).

plaintiff must also show that "the inadequacy was closely related to or actually caused the injury." *Id.* (internal quotation marks and citation omitted). Accordingly, a failure-to-train claim "requires a showing of prior instances of unconstitutional conduct demonstrating that the municipality had ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury." *Burgess*, 735 F.3d at 478 (citation modified). But, where there is no tort or constitutional violations, a municipality cannot be liable. *See Davenport*, 521 F.3d at 554.

To support his claim, Lulgjuraj presents evidence that the HCMA appears to have no official policy or trainings about banning people and that the officers conceded that they had banned people in the past without knowing whether they had the authority to do so. *See* ECF Nos. 25-10 at PageID.901; 25-5 at PageID.751; 25-6 at PageID.751–52, 781. In fact, Lieutenant Belmonte admitted that he had banned people from the Park previously but had not been trained or instructed about banning nor ever "checked to determine whether [he] had authority to do that." ECF No. 25-6 at PageID.751–52. But Lulgjuraj does not present any evidence that these prior instances of banning warranted *unconstitutional conduct*. *See Burgess*, 735 F.3d at 478. Indeed, Lulgjuraj has not shown that banning people from a public park without express authority is, itself, unconstitutional, much less that the prior instances of banning occurred as unlawful retaliation against people who exercised their First

Amendment rights. *See id.*; *see also Jackson v. Corizon Health Inc.*, 596 F. Supp. 3d 834, 843 (E.D. Mich. 2022). This lack of evidence is fatal for Lulgjuraj because his *Monell* claim "must also identify a connection between the policy or custom and the unconstitutional conduct that led to his injury; the policy or custom must be the 'moving force' behind the eventual constitutional violation." *Jackson*, 596 F. Supp. 3d at 843 (citing *Jackson v. City of Cleveland*, 925 F.3d 793, 828 (6th Cir. 2019)). Thus, because Lulgjuraj presents no evidence that the prior instances of banning were unconstitutional conduct, this claim will be dismissed. *See id.*

### E. Motion to Strike

Defendants also moved to strike Lulgjuraj's police expert, Thomas Tiderington, whose testimony Lulgjuraj seeks to use as supportive evidence. ECF No. 20 at PageID.511–12 (outlining Tiderington's expert opinions); *see also* ECF Nos. 20-3; 20-4. But because summary judgment will be granted fully, Tiderington's testimony is no longer relevant. Therefore, this motion will be denied as moot.

### IV. CONCLUSION

Accordingly, it is **ORDERED** that Defendants' Motion for Summary Judgment, ECF No. 16, is **GRANTED**.

It is further **ORDERED** that Defendants' Motion to Strike, ECF No. 20, is **DENIED AS MOOT.**

**IT SO ORDERED.**

**This is a final order and closes the above-captioned case**.

*/s/Susan K. DeClercq*
SUSAN K. DeCLERCQ
United States District Judge

Dated: February 16, 2026